UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
RIVERKEEPER, INC.,                   :
                                             :
                        Plaintiff,       :        <u>MEMORANDUM &</u>
                                               :        <u>ORDER</u>
        -against-                 :        14-CV-1055 (NGG) (SMG)
                                               :
BROOKLYN READY MIX CONCRETE, LLC, and   :
MICHAEL SEARS,                             :
                                               :
                        Defendants.     :
------------------------------------------------------------------ x
GOLD, STEVEN M., U.S.M.J.:

**INTRODUCTION**

In February 2014, plaintiff Riverkeeper, Inc. commenced this citizen suit enforcement

action against defendant Brooklyn Ready Mix Concrete, LLC ("BRM") and BRM's principal,

defendant Michael Sears, alleging violations of the Federal Water Pollution Control Act, 33

U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA").  Complaint ("Compl."), Docket Entry 1.

At all times relevant to the complaint, BRM owned and operated a ready mix concrete plant at

470 Scott Avenue in Brooklyn, New York, and Sears was its CEO.  Consent Decree, Docket

Entry 18, at 1.  Riverkeeper alleged in its complaint that BRM had illegally discharged polluted

stormwater runoff into nearby Newtown Creek.  Compl. ¶ 2.

In October 2014, the parties entered into a consent decree, Docket Entry 11, which was

so ordered by United States District Judge Garaufis in April 2015.  Consent Decree.[1]  The

consent decree provided, among other things, that defendants would "operate the Facility in

compliance with the applicable requirements of the Clean Water Act."  Consent Decree ¶ 15.  In

exchange, Riverkeeper agreed to release defendants from liability for the past conduct described

---

[1] The Department of Justice also reviewed the consent order and did not register any objections to it.  Docket Entry 13.

in the complaint. Consent Decree ¶ 30. The parties agreed that this Court would retain

jurisdiction should Riverkeeper seek to enforce the consent decree, and also provided that any

disputes arising from the consent decree that required court intervention would be resolved

before me. Consent Decree ¶¶ 38, 40.

In November 2015, Riverkeeper moved to enforce the consent decree against defendants,

alleging subsequent violations of the Clean Water Act that, in turn, violated the consent decree.

Docket Entry 19. In January 2016, Riverkeeper moved to hold defendants in civil contempt.

Docket Entry 24.[2] Riverkeeper's motions are based on their contention that defendants, on at

least five separate occasions in August and September 2015, "discharged a cement-laden mixture

of polluted water directly into Newtown Creek." Pl. Mem. at 3. Riverkeeper seeks a

compensatory sanction in the amount of $187,500, as well as recovery of its attorney's fees. Pl.

Mem. at 8-10; Pl. Reply at 2.

At an evidentiary hearing on May 23, 2016, Riverkeeper presented testimony from

Michael Vergona, an eyewitness to the alleged violations. Defendant Sears testified at the

hearing as well. Also before the Court are the parties' pre- and post-hearing submissions.

For the reasons that follow, Riverkeeper's motions are granted, and defendants are

ordered to pay a $50,000 penalty to Riverkeeper, as well as Riverkeeper's attorney's fees and

costs of $79,776.39.

---

[2] In reviewing these motions, I drew from the following: Plaintiff's Memorandum in Support of Contempt Motion ("Pl. Mem."), Docket Entry 24-1; Affidavit of Michael Vergona ("Vergona Aff."), Docket Entry 24-2, and attached Exhibits A-O; Declaration of Edan Rotenberg ("Rotenberg Decl."), Docket Entry 24-5, and attached Exhibits A-E; Declaration of Neale Gulley ("Gulley Decl."), Docket Entry 24-6; Affirmation of George Vlachos in Opposition to Contempt Motion ("Defs. Opp."), Docket Entry 26, and attached Exhibits A-B; Affidavit of Michael Sears ("Sears Aff."), Docket Entry 35; Reply Declaration of Edan Rotenberg ("Rotenberg Reply Decl."), Docket Entry 27, and attached Exhibits A-E; Plaintiff's Letter to the Court dated May 12, 2016 ("Pl. 5/12/16 Letter"), Docket Entry 40, and attached Exhibits A-I; Plaintiff's Letter to the Court dated May 19, 2016 ("Pl. 5/19/16 Letter"), Docket Entry 41; Defendants' Post-Hearing Summation ("Defs. Summation"), Docket Entry 43; and Plaintiff's Post-Hearing Summation ("Pl. Summation"), Docket Entry 44, and attached Exhibits A-B.

**BACKGROUND**

The pending motions arise from the observations of Michael Vergona, a construction worker who operated a tower crane during the construction of the new Kosciuszko Bridge in Brooklyn, New York. Transcript of Hearing on May 23, 2016 ("Tr.") 7:12-25, Docket Entry 45. Vergona reported to Riverkeeper that he had witnessed certain individuals on defendants' property "pump[ing] a grayish liquid into Newtown Creek" on August 31, September 1, September 10, September 11, and September 14, 2015. Vergona Aff. ¶¶ 2-3; Rotenberg Decl. Ex. C. More specifically, as stated in his affidavit, Vergona

> observed these individuals running a hose connected to a motorized pump from a basin on the Property containing a grayish liquid over a concrete wall and into a wooded area on the bank of Newtown Creek, causing the grayish liquid to enter Newtown Creek. This caused a plume to form, as well as visible contrast in Newtown Creek.

Vergona Aff. ¶ 3. Vergona reiterated this testimony during the evidentiary hearing. Tr. 12:19-15:1. The conduct described by Vergona would violate 33 U.S.C. § 1311(a), which prohibits the discharge of any pollutant by any person unless specifically authorized, and 33 U.S.C. § 1342(p)(2)(B), which requires a permit for stormwater discharge associated with industrial activity.

On or around September 2, 2015, Vergona contacted Neale Gulley, a Riverkeeper employee, and sent him photographs depicting these alleged environmental law violations. Gulley Decl. ¶ 3; Rotenberg Decl. ¶ 6; Rotenberg Reply Decl. ¶ 2 and Ex. A. By letter dated September 10, 2015, counsel for Riverkeeper notified Sears of the alleged violations. Rotenberg Decl. Ex. B. This letter was sent by Federal Express—which confirmed delivery on September 11, 2015 at the 470 Scott Avenue address—and also by email, to which Sears responded on September 12, 2015. Rotenberg Reply Decl. Exs. B-E. Vergona then forwarded additional

photographs to Gulley on September 14, 2015. Gulley Decl. ¶ 4; Rotenberg Decl. Ex. C. According to Riverkeeper's counsel, this second batch of photographs was taken while Sears was on a conference call with three attorneys for Riverkeeper. Sears insisted during the call, at or about the very same time plaintiff contends that the photographs were being taken, that defendants were in full compliance with the consent decree. Rotenberg Decl. ¶ 8.

Fifteen of Vergona's photographs are now before the Court. Vergona Aff. Ex. A-O. Vergona represents that these photographs were taken on the five days of alleged violations and are fair and accurate depictions of what he observed. Vergona Aff. ¶ 5; Tr. 17:22-25. Counsel for Riverkeeper has provided the Court with the original electronic files of the photographs, each of which contains metadata that substantiates plaintiff's claim that the file name for each photograph establishes the date and time when it was taken. Rotenberg Decl. ¶ 9 and Ex. E; *see also* Tr. of Conference on Apr. 18, 2016 at 26:20-27:19, Docket Entry 37.[3] Accordingly, Riverkeeper has demonstrated that two photographs were taken on each of August 31 and September 1, 2015, three photographs were taken on each of September 10 and 11, 2015, and five photographs were taken on September 14, 2015. Pl. 5/12/16 Letter, Ex. A.

Collectively, the photographs show cement trucks and other vehicles surrounding a basin containing a murky, gray liquid. Different colored hoses appear to be submerged, at one end, in or near the basin, then strung along the ground and over a wall abutting a body of water. The other ends of the hoses are positioned over the wall and, although slightly obscured by foliage, plumes of some opaque substance in the body of water can be seen emanating from around the

---

[3] For example, Exhibit O's file name is "20150914_110215.jpg," which suggests a creation date and time of September 14, 2015 at 11:02:15 A.M. The electronic properties of this file list the "Date taken" as "9/14/2015 11:02 AM."

wall.  One photograph shows a cement truck with the 470 Scott Avenue address on its side, as well as what appears to be defendants' company logo.  Vergona Aff. Ex. C.

Sears strongly denies Riverkeeper's allegations of illegal dumping.  Sears Aff. ¶ 6.  He maintains that neither he nor his staff has "any knowledge of any water from [the] facility going into the river."  Sears Aff. ¶ 8; *see also* Tr. 82:3-6.  He also offers an alternative explanation of the photographs:

> Some of the photographs depict mere construction on the Kosciuszko Bridge and do not show any dumping or polluting.  Some of the photographs show bins of concrete with hoses coming out of them.  What these photographs are actually depicting are bins of lightweight aggregate concrete which must be kept moist at all times.  The hoses going into and/or out of those bins are used to add water into the concrete to keep it moist.

Sears Aff. ¶ 10.  Sears initially challenged the creation dates of the photographs, stating that they were likely taken prior to the effective date of the consent decree.  Sears Aff. ¶ 11.  He backed off this position at the hearing, however, testifying that he has "no way of truly knowing when the pictures were taken."  Tr. 82:16-84:12.

## DISCUSSION

A.    *Civil Contempt*

A defendant may be held in civil contempt of a consent decree where a plaintiff establishes that (1) the decree was clear and unambiguous, (2) the proof of non-compliance is clear and convincing, and (3) the defendant has not been reasonably diligent and energetic in attempting to comply.  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008).

1.    It Is Undisputed that the Consent Decree Was Clear and Unambiguous

Riverkeeper states that the consent decree is unambiguous because "[t]he central prohibition of the Clean Water Act, and the essence of the bargain in this case, both require Defendants to refrain from discharging pollution into Newtown Creek."  Pl. Mem. at 5-6.

Defendants do not appear to challenge the clarity or meaning of the consent decree, but rather deny plaintiff's contention that they discharged pollutants into the creek. Indeed, there is no real dispute that the conduct that Riverkeeper alleges, if found to have occurred, would violate the unambiguous terms of the consent decree.

2. Proof of Defendants' Non-Compliance Is Clear and Convincing

Central to Riverkeeper's accusations against defendants are the photographs taken by Vergona. Defendants initially questioned the photographs' chain of custody and the evidence establishing the dates and times that they were created. Defs. Opp. ¶¶ 14-21. During and after the hearing, defendants challenged whether the photographs actually depicted BRM employees polluting Newtown Creek, and also suggested an alternative theory for how the creek became discolored. Defs. Summation at 1-2. However, for the reasons set forth below, I conclude that the photographs and testimony presented at the hearing by Riverkeeper persuasively demonstrate that defendants violated the consent decree.

a. The Photographs Are Admissible and Authentic

"The standard for admissibility of photographs requires the witness to recognize and identify the object depicted and testify that the photograph is a fair representation of what it purports to portray." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009). Vergona clearly states in his affidavit that he was the photographer and that the photographs he took are fair and accurate representations of what he observed. He testified similarly at the hearing. Thus, plaintiff has offered an adequate foundation for admission of the photographs.

Defendants also question the authenticity of the photographs by claiming that Riverkeeper did not receive them until September 14, 2015—four days after its September 10,

2015 letter to defendants about potential violations. Defs. Opp. ¶ 9. Coupled with Sears' initial

claim that "[i]t is very possible and likely" that these photographs were taken before the parties

entered into the consent decree, Sears Aff. ¶ 11, defendants seem to suggest that Riverkeeper

merely scraped together this photographic evidence in a belated attempt to buttress its

accusations.

However, defendants misapprehend the underlying timeline of events. As is clear from

the moving papers, Riverkeeper received the first group of photographs on or before September

2, 2015, Rotenberg Reply Dec. Ex. A, thus providing Riverkeeper with ample basis for alerting

defendants to the alleged violations in the September 10, 2015 letter. Vergona also confirmed

that Riverkeeper first contacted him some time after he took the first photograph but before he

took the last one. Tr. 38:6-21. Finally, defendants have not produced any evidence calling into

question the reliability of the metadata establishing the photographs' creation dates. For

example, defendants did not arrange for a forensic examination of the camera or the photographs,

despite being given such an opportunity by the Court. Tr. of Conference on Apr. 18, 2016 at

18:13-25. In short, defendants' challenges to the authenticity of the photographs are not

persuasive.

> b.  The Photographs Establish that Defendants Polluted Newtown Creek

As stated above, the photographs appear to show employees of BRM dumping concrete

washout into Newtown Creek by pumping the contaminated water through hoses that originate at

the concrete washout basin and empty over a wall overlooking the creek. At the hearing,

Vergona testified:

> They were pumping some sort of concrete washout, it looked like. A hose ran
> across the yard, up over the wall. Most of the time, there was a guy standing on
> the wall watching the hose. The hose went over the wall and into the river, from
> what I could see.

Tr. 13:12-17. Vergona further testified that "where the concrete trucks would wash out the used concrete was the same area from where they had the hose and the pump running across the yard and what appeared to be over the wall into the river." Tr. 14:9-13. Vergona also stated that the liquid in the wash pit appeared "milky white," and that this "same colored substance that was on one end of the hose ended up disbursing out into [Newtown Creek]." Tr. 14:14-21. He noted that he only observed this discoloration in the creek when BRM's hoses were present. Tr. 14:22-15:1, 55:6-11.

Defendants argue that none of the photographs explicitly show any substance entering Newtown Creek from BRM's hoses. Defs. Summation at 1. Vergona conceded this point on cross-examination, although he explained that trees along the water wall prevent a clear view of the ends of the hoses. Tr. 47:18-48:23. Defendants argue that this evidentiary shortcoming alone establishes that Riverkeeper has failed to meet its burden. Defs. Summation at 1. Plaintiff's failure to produce a photograph explicitly showing unclean water entering Newtown Creek from one of BRM's hoses, though, is hardly fatal to its motions. The most logical and compelling inference to be drawn from photographs showing a plume of pollution emanating from around BRM's water wall is that the hoses depicted near the water wall are the pollution's source. Likewise, although defendants correctly point out that the effluent was never tested, Defs. Summation at 1-2, such testing is unnecessary—at least with respect to whether a violation occurred—when the impurity of the water entering the creek is patently clear from the photographs.

Defendants suggest alternative ways of interpreting the photographic evidence. First, Sears claims that his employees were not polluting the creek, but instead were using the hoses to soak lightweight aggregate stone contained in a bin abutting BRM's water wall. Sears testified

that an employee would bring a hose over the water wall and angle it toward the bin, where the water would then drip down the wall and over the lightweight aggregate before running back down to the washwater basin, or "recycling pit." Tr. 61:14-62:9, 65:14-18, 75:5-76:20. He further stated that, although one of the photographs appears to show an employee positioning the hose over the wall such that any water leaving the hose would be dumped into Newtown Creek, the photograph was actually taken while the employee was in the process of bringing the hose across the water wall and over to the lightweight aggregate bin. Tr. 79:9-23; *see* Vergona Aff. Ex. N. When counsel for Riverkeeper presented Sears with evidence that there had been significant rainfall during the days preceding some of the dates of the photographs, Sears claimed that, if there were plans to use the lightweight aggregate, it would get soaked by the hoses regardless of recent rainfall or whether it had recently been soaked. Tr. 96:12-99:23. Thus, defendants suggest that the stone's recent saturation does not undermine their contention that BRM employees were merely soaking the stone as opposed to polluting the creek.

Second, defendants posit that the visible discoloration in the creek shown in the photographs could have been caused by spillage of the concrete used in the construction of the Kosciuszko Bridge. Defs. Summation at 2. Sears claimed that clam shell concrete buckets— such as those used during the bridge construction in which Vergona was involved when he took the photographs—always drip, and that these dripping buckets will sway in the wind when being hoisted by cables. Tr. 77:6-78:3, 92:7-24. Thus, defendants suggest that concrete may have spilled into Newtown Creek as construction workers raised these concrete buckets into place. Defense counsel attempted to probe this theory when examining Vergona, but Vergona insisted that the concrete bucket never dripped, swung in the air, or even went over the water. Tr. 34:20-35:15, 46:9-47:17.

Defendants' attempts to explain away Riverkeeper's photographic evidence are unpersuasive. While Sears painted an alternative picture of the actions of his employees, he admitted that he had not personally supervised the site since 2009. Tr. 61:5-7. Vergona, on the other hand, was an eyewitness to the events. Moreover, defendants failed to develop any duplicitous motive for Vergona, whose demeanor throughout the hearing seemed credible and whose testimony was logical and inherently consistent. In contrast, Sears' claim that the lightweight aggregate stone "can never get enough water," Tr. 95:6-96:11, and would be soaked even after heavy rainfall, makes little sense, especially given that, as Sears acknowledged, water is a valuable commodity. Tr. 72:16-23. Nor did defendants present testimony from an independent witness with expertise in the field to corroborate Sears' testimony about the benefits of soaking aggregate even after heavy rainfall. Finally, the photographs presented by plaintiff, and in particular Exhibit N, show defendants' hose running over the wall toward the creek and not toward the area where the aggregate was stored. This fact is particularly striking because arranging the hose depicted in Exhibit N so that it could soak the aggregate would have required bringing the hose back across the wall; there was, in other words, no reason to place the hose over the wall if the intended purpose for the hose was to soak the aggregate stone.

Defendants' argument concerning concrete spillage from the bridge's construction also strains credulity; not only does this theory overlook that the pollution appears to originate at the point along the wall where the mouths of the hoses are pointed, but it also fails to account for the location of the rippling plume emanating from around the water wall. If the discoloration were caused by spillage, one would expect to see the plume closer to the construction site, not adjacent to BRM's plant. In short, Vergona's account is completely consistent with the photographic evidence and its most logical interpretation, while Sears' account is belied by it. Accordingly, I

find that defendants have failed to rebut the clear and convincing evidence presented by Riverkeeper establishing that defendants violated the consent decree.

3. <u>Defendants Have Not Been Reasonably Diligent and Energetic in Their Attempted Compliance with the Consent Decree</u>

Riverkeeper argues that defendants' lack of reasonable diligence is evident from their violation of the consent decree. Pl. Mem. at 6-8. Defendants counter that Riverkeeper has alleged a violation of only one aspect of the consent decree, and assert that their attempted compliance is evidenced by the myriad of conditions in the consent decree about which Riverkeeper has not registered any complaint. Defs. Opp. ¶¶ 23-25. As Riverkeeper points out, though, the provision allegedly violated by defendants was the heart of the agreement; defendants cannot establish their diligence by highlighting other less significant portions of the consent decree that they have managed not to breach.

4. <u>Defendants' Additional Defenses</u>

Defendants raise four additional arguments in their defense. First, defendants claim that Riverkeeper failed to comply with the notice provision of the consent decree, which requires seventy-two hours' written notice before initiating court proceedings. Defs. Opp. ¶ 8; Consent Decree ¶ 39. Riverkeeper first sought court invention on November 24, 2015, more than two months after its September 10, 2015 letter advising defendants that it would move for sanctions if the parties could not resolve the instant dispute. Although defendants claim that they never received this letter, their contention is belied by the proof of delivery slip signed at the 470 Scott Avenue address, as well as by Sears' own responsive email two days later. Rotenberg Reply Decl. Exs. B-E.

Second, defendants assert that, pursuant to 33 U.S.C. § 1365(b)(1)(B), Riverkeeper is barred from maintaining this action because BRM has already agreed to enter into an order on consent with the New York Department of Environmental Conservation ("DEC") regarding these same alleged violations. Defs. Opp. ¶¶ 3-6.[4] Section 1365(b) provides that a private citizen may not commence an action concerning effluent standards if the government has already initiated and is diligently prosecuting a civil or criminal case to secure compliance with the same standards. This provision plainly pertains to the commencement of citizen actions, not their continued prosecution. Moreover, the bar applies only when the government has already brought an action in court, not where, as here, the government pursues an administrative enforcement action without court supervision. *See Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985).

Third, defendants allege that Riverkeeper failed to engage in good faith settlement negotiations as required under the consent decree, and that any attempt to discuss settlement was thwarted by Riverkeeper's "outrageous settlement demands." Defs. Opp. ¶ 10; Consent Decree ¶ 40. However, the consent decree only obligated the parties "to request a settlement meeting before the Magistrate Judge," which is exactly what Riverkeeper did in its November 24, 2015 letter to the Court. Docket Entry 19. Although it appears that the subject of settlement was not broached during the subsequent December 3, 2015 telephone conference, Docket Entry 22, defendants were in no way precluded from making a settlement offer at that time, or later, if they so desired. Instead, counsel for defendants stated that they were "more than happy to go forward

---

[4] Defendants submitted this consent decree in their original opposition to Riverkeeper's motions. Defs. Opp. Ex. A. Although defendants admitted to having violated certain provisions of the New York Environmental Conservation Law by "discharging industrial process wastewater to Newtown Creek . . . through a hose . . . ," DEC Consent Decree ¶ 17, civil consent decrees are governed by Federal Rule of Evidence 408 and are inadmissible to substantiate claims of liability. *See In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011). Accordingly, the Court has not considered this statement in rendering its decision.

to take a look at whatever evidence [Riverkeeper's] counsel has and to go forward and have the judge hear the case on its merits. We're ready to do that now." Audio R. 3:11:13-25.

In addition, defendants' suggestion that Riverkeeper made an outrageous settlement demand is misguided. Riverkeeper proposed that Sears place $175,000 in escrow in return for Riverkeeper agreeing not to move for seizure of defendants' property under Rule 64 of the Federal Rules of Civil Procedure. Audio R. 3:13:56-3:15:26. As discussed below, this amount was based on Riverkeeper's attorney's fees and the relevant statutory damages provision of the CWA; thus, it was a reasonable approximation of the amount that could potentially be awarded in this case. In any event, nothing prevented defendants from making what they perceived to be a reasonable settlement offer regardless of the amount demanded by Riverkeeper.

Fourth, defendants claim that it was improper for Riverkeeper to name Sears as a defendant in this action because Sears "does not have nor has he ever had any interest or affiliation with Brooklyn Ready Mix Concrete, LLC." Defs. Opp. ¶ 7. Sears' affidavit, though, states that he is the president of "B.R.M. Concrete, Inc." Sears Aff. ¶ 2. According to Sears, Riverkeeper incorrectly sued B.R.M. Concrete, Inc. as "Brooklyn Ready Mix Concrete, LLC." Sears Aff. ¶ 2. Although he denies any relationship to Brooklyn Ready Mix Concrete, LLC, he admits that he is an officer of B.R.M. Concrete, Inc., which, he acknowledges, is a defendant in this action.[5] Thus, as its principal, he was properly named in this action.

In summary, none of the defenses raised by defendants calls into question the finding that they violated the consent decree.

---

[5] The signature line above which Sears signed the consent decree describes him as the CEO of Brooklyn Ready Mix Concrete, LLC. Consent Decree at 15. Defendants state that this alleged mistake occurred because Sears was not represented by counsel at the time the agreement was executed. Defs. Opp. ¶ 7.

B.      *Damages Under the Clean Water Act*

Courts are afforded broad discretion when calculating civil penalties under the CWA.

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 87 (2d

Cir. 2006) (citations omitted).  Initially, courts may choose from one of two calculation methods:

the "bottom-up" method, which begins with the violator's estimated economic benefit from

noncompliance, or the "top-down" method, which begins with the maximum allowable penalty

under the statute.  *Id.* (citation omitted).  Under the latter approach, the maximum allowable

penalty, once calculated, may then be adjusted after the court considers the following six factors:

"(1) the seriousness of the violations; (2) the economic benefit resulting from the violation; (3)

any history of violations; (4) good-faith efforts to comply with applicable requirements; (5) the

economic impact of the penalty on the violator; and (6) other matters as justice may require."  *Id.*

(citing 33 U.S.C. § 1319(d)).  Here, the top-down method will be applied.

Violations of 33 U.S.C. §§ 1311 and 1342 carry a maximum fine of $37,500 per day for

each violation.  *See* 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.  For each of the five days that

Vergona took photographs of BRM's plant, there is at least one photograph depicting

discoloration in Newtown Creek and a hose positioned near or over BRM's water wall.  *See*

Vergona Aff. Exs. A, B, D, E, G, J, K, L, M.  Accordingly, there is evidence that defendants

polluted the creek on five separate occasions.  Accordingly, I calculate the maximum allowable

penalty to be $187,500 (5 days x $37,500/day).  I now consider whether any adjustment is

warranted by applying the six factors described above.

1.      The Seriousness of the Violations

"To determine the seriousness of a defendant's violations, the court should consider the

frequency and severity of the violations as well as their effect on the environment."  *Catskill*

*Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 244 F. Supp. 2d 41, 49-50

(N.D.N.Y. 2003), *aff'd in part and remanded in part on other grounds*, 451 F.3d 77 (2d Cir.

2006) (internal quotation marks and citation omitted); *see also, U.S. v. Smith*, 2014 WL 3687223,

at *12 (S.D.Ala. July 24, 2014) (factors to be considered include "toxicity of the discharged

substance").  With respect to the frequency of defendants' violations, the evidence establishes at

least five distinct infractions in a fifteen-day period.  As to the impact on Newtown Creek,

Riverkeeper has submitted an article from the Environmental Protection Agency warning that

concrete washout is caustic, corrosive, and harmful to fish, and may also contribute to the

increased toxicity of other substances.  Pl. 5/12/16 Letter Ex. D at 1.  Riverkeeper has also

submitted evidence describing the various bird and aquatic species that live in Newtown Creek.

Aff. of Willis Elkins Ex. A-C, Pl. 5/19/16 Letter.

 Notably absent from the record, however, is evidence of the specific harm caused by

defendants' actions.  Riverkeeper notes in its memorandum that the cost of an assessment of the

damage to Newtown Creek would be prohibitive.  Pl. Mem. at 8.  While it may be the case that

there are better uses for Riverkeeper's resources, the Court cannot overlook this shortcoming,

and consequently considers this element to be a mitigating factor.

 2. <u>The Economic Benefit Resulting from the Violations</u>

 The extent of the economic benefit resulting from a defendant's violation of the CWA is

"of key importance."  *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d

1128, 1141 (8th Cir. 1990).  Reasonable approximations of this amount are sufficient, with

uncertainties to be resolved in favor of a higher estimate.  *Trout Unlimited*, 244 F. Supp. 2d at

50.

Riverkeeper argues that defendants "avoided the costs of permit compliance, including monitoring and sampling, making capital investments in better pollution controls or a larger reclamation system, or in renting any additional land that would be required to accommodate such a system." Pl. Summation at 11. Although Riverkeeper is likely correct in its contention, the record is devoid of any evidence addressing this element. Neither party has presented any evidence regarding the cost of the proper permit or how expensive it would have been for defendants to install a proper reclamation system. While uncertainties should be resolved against the violator, this cannot be so when there are no estimates at all before the Court. Accordingly, the Court finds this to be a mitigating factor.

3.      Defendants' History of Violations

Riverkeeper has not presented any evidence that defendants have a history of environmental law violations. Because a lack of such history "supports a significant decrease from the maximum," *Smith*, 2014 WL 3687223, at *14, the Court finds this to be a significant mitigating factor.

4.      Defendants' Good-Faith Efforts to Comply with Applicable Requirements

"Evidence of good faith efforts may include proof of insufficient or inadequate efforts to comply, conducting environmental compliance audits, hiring consultants, or similar endeavors to obey permitting requirements." *Smith*, 2014 WL 3687223, at *14 (citing *U.S. v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 347-49 (E.D.Va. 1997)). Defendants have not demonstrated that they made good faith attempts to comply with the consent decree that were frustrated for reasons beyond their control; rather, defendants simply but erroneously contend that their conduct complied with the decree. Moreover, although Riverkeeper notified Sears of the instant violations on September 10, 2015, defendants continued their illicit dumping into Newtown

Creek on both September 11 and 14, 2015. The latter of these two infractions is especially egregious given that receipt of Riverkeeper's notice was confirmed when Sears responded via email on September 12, 2015. Moreover, in a September 14, 2015 email to Riverkeeper's counsel sent just thirty minutes after Vergona's final photograph was taken, Sears represented that neither he nor his staff "ha[d] any knowledge of any water being pumped into the [creek]." Rotenberg Decl. Ex. D; Vergona Aff. Ex. O. Despite Riverkeeper's having alerted defendants to their ongoing environmental violations, no corrective actions were taken. I therefore do not give this factor any mitigating weight.

 5. The Economic Impact of the Penalty on the Violator

A defendant invoking this factor in mitigation bears the burden of establishing that a civil contempt penalty "would be ruinous or otherwise disabling." *Smith*, 2014 WL 3687223, at *15. When determining the extent of the penalty, though, courts should consider whether "the maximum penalty would have a more drastic effect on a defendant than is needed to ensure future compliance." *Id.* Conversely, courts should be mindful that an award limited to a defendant's economic benefit from noncompliance "is no deterrent at all because the violator would be no worse off than if it had complied in the first place." *Trout Unlimited*, 244 F. Supp. 2d at 53 (internal quotation marks and citation omitted).

In advance of the evidentiary hearing, the Court directed defendants to produce any tax returns that they intended to rely on in opposing Riverkeeper's motions. Docket Entry 34. In response, defendants submitted two incomplete corporate tax returns from 2013 and 2014. Docket Entry 38. BRM's 2013 tax return indicates a loss of $102,569, with $104,000 of compensation paid to corporate officers, and their 2014 tax return indicates a profit of $437,457, with $106,000 of officer compensation. As Riverkeeper notes, Sears is the only known

corporate officer of BRM. Pl. Summation at 11-12. Essentially, defendants broke even in 2013 and enjoyed a combined net income exceeding $540,000 in 2014. This is hardly evidence that defendants would not be able to withstand the maximum penalty suggested by Riverkeeper. At a minimum, defendants should immediately be able to pay the $75,000 that they placed in escrow on or before December 18, 2015. Joint Status Report, Docket Entry 23. Defendants' financial condition is therefore not a mitigating factor.

6. <u>Other Matters as Justice May Require</u>

Courts have used this final factor to analyze whether the civil penalty to be assessed is equitable in view of the penalties imposed in other similar cases. *Smith*, 2014 WL 3687223, at *15. To that end, Riverkeeper has pointed the Court to a 2005 criminal prosecution from this district in which a ready-mix cement company pleaded guilty to discharging concrete washwater into Newtown Creek without a permit. Pl. 5/12/16 Letter Ex. F; *see also U.S. v. Empire Transit Mix Inc.*, No. 05-CR-319 (E.D.N.Y. filed Apr. 21, 2005). The defendant in that case was fined a total of $300,000 for eight separate unlawful discharges; this amount, apparently coincidentally, is equivalent to the daily sanction of $37,500 sought by Riverkeeper. While this case is not a criminal prosecution, but rather a civil citizen enforcement action, defendants here were given the chance to remediate their alleged violations to avoid liability altogether. Defendants' failure to take advantage of this opportunity, as well as the hefty fine imposed in a substantially similar case, militates against a lighter penalty.

However, the Court also considers that Sears sold the plant on September 28, 2015, Tr. 60:16-19, thereby eliminating the risk of continued violations by defendants at this location. Moreover, although Sears operates another concrete plant in Suffolk County, counsel for Riverkeeper stated that he was not aware of any violations that have taken place at that location.

Tr. of Conference on Apr. 18, 2016 at 3:19-4:8. The diminished prospect of future infractions thus cuts in favor of a reduced penalty.

       7.    <u>Conclusions as to Civil Penalty</u>

As stated above, defendants are subject to a maximum penalty of $187,500. Taking into account the mitigating factors of 33 U.S.C. § 1319(d) discussed herein, the Court determines that a penalty of $10,000 per violation, for a total penalty of $50,000, is appropriate in this case. I reach this conclusion in part because defendants will be required to pay as well a substantial amount in attorney's fees and costs, as discussed more fully below.

C.    *Attorney's Fees and Costs*

Riverkeeper seeks all of the costs and attorney's fees it incurred in this litigation. Pl. Summation at 13. For disputes arising from the consent decree, the parties agreed that the Court "shall have discretion to award attorney's fees and costs" as permitted under the CWA and Rule 11 of the Federal Rules of Civil Procedure. Consent Decree ¶ 41. The CWA also provides that a court, in issuing a final order in a citizen enforcement action, may in its discretion award costs of litigation, including attorney's fees. 33 U.S.C. § 1365(d).

"Courts in the Eastern District of New York award hourly rates ranging from $200 to $450 per hour for partners, $100 to $300 per hour for associates, and $70 to $100 per hour for paralegals." *Hall v. ProSource Technologies, LLC*, 2016 WL 1555128, at *12 (E.D.N.Y. Apr. 11, 2016). Counsel for Riverkeeper have billed at the following rates: $317.70 per hour for Edan Rotenberg, an attorney with eight years of experience; $264.75 per hour for Nicholas Tapert and Alice Baker, attorneys with four and five years of experience respectively; $211.80 per hour for Kimberly Klein, an attorney with one year of experience; and $95.31 per hour of paralegal

work.[6]  Pl. 5/12/16 Letter at 4.  In view of the rates typically awarded in this district, I find the proposed rates to be reasonable.

Counsel has requested a fee of $82,204.88, and has submitted time records in support of their application.  Pl. Summation at 13 and Ex. B.  This total reflects three notable downward adjustments: no charge for the "time spent by Alice Baker and Nicholas Tapert where their participation in the case was not critical and served equally to help them gain experience"; no charge for the 7.5 hours of work billed by the firm's senior partner; and a reduction for some of the entries concerning "internal coordination with the firm."  Pl. 5/12/16 Letter at 5.  With respect to the latter adjustment, the Court notes that these deductions constituted a minority of the internal conference entries and ranged from just 0.1 to 0.4 hours.  Had the case been more leanly staffed, many of the fees resulting from internal conferences and reviewing and editing co-counsel's work product would not have been incurred.  In light of the proactive downward adjustments made by Riverkeeper, however, only a modest 5% across-the-board reduction is warranted.  Accordingly, Riverkeeper is awarded $78,094.64 in attorney's fees.

Counsel also seek $1,681.75 for various costs expended over the course of this litigation. Pl. Summation Ex. B.  Having reviewed the itemized list of costs that counsel have provided, the Court finds this request to be reasonable, and awards this amount to Riverkeeper.

---

[6] In calculating its attorney's fees, Riverkeeper used some of the prevailing rates stated in a 2013 case from this district, then applied a formula to adjust for inflation since then.  Pl. 5/12/16 Letter at 3-4.

**CONCLUSION**

For the reasons stated above, Riverkeeper's motions to enforce the consent decree and for civil contempt are granted, and defendants are hereby ordered to pay Riverkeeper $129,776.39, comprising a $50,000 civil penalty and a $79,776.39 award of attorney's fees and costs.

SO ORDERED.

_____
                s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
August 16, 2016

*U:\MF 2015-2016\Riverkeeper v. Brooklyn Ready Mix, LLC et al\Riverkeeper M&O FINAL.docx*